IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEANETTE D. MOYER,            :
                              :
            Plaintiff         :    CIVIL NO. 4:11-CV-1186
                              :
      vs.                     :
                              :
MICHAEL J. ASTRUE,            :
COMMISSIONER OF SOCIAL        :    (Judge Rambo)
SECURITY,                     :
                              :
            Defendant         :

**M E M O R A N D U M**

**Background**

        Plaintiff, Jeanette D. Moyer, is seeking review
of a decision of the Commissioner of Social Security
("Commissioner") denying her claim for social security
disability insurance benefits.  For the reasons set
forth below, the court will affirm the decision of the
Commissioner.

        Moyer protectively filed[1] her application for
disability insurance benefits on February 12, 2008.  Tr.

---

1.  Protective filing is a term for the first time an
individual contacts the Social Security Administration
to file a claim for benefits.  A protective filing date
allows an individual to have an earlier application
date than the date the application is actually signed.

13, 99, 158, 164-167, 170 and 265.[2]  The application was initially denied by the Bureau of Disability Determination on April 30, 2008.[3]  Tr. 119-123.  On May 20, 2008, Moyer requested a hearing before an administrative law judge. Tr. 124-125.  A hearing was held before an administrative law judge on January 20, 2010. Tr. 27-69.  On February 24, 2010, the administrative law judge issued a decision denying Moyer's application. Tr. 13-25.  On March 30, 2010, Moyer filed a request for review with the Appeals Council, and after about 14 months had passed, the Appeals Council on May 12, 2011, concluded that there was no basis upon which to grant Moyer's request for review. Tr. 1-3 and 7.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

---

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of her Answer on August 26, 2011.

3.  The Bureau of Disability Determination is an agency of the state that initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.  Tr. 119.

Moyer then filed a complaint in this court on June 22, 2011.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on December 27, 2011, when Moyer elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Moyer met the insured status requirements of the Social Security Act through March 31, 2011. Tr. 13, 15 and 168.

Moyer, who was born in the United States on September 21, 1971,[5] graduated from high school in 1990

---

4.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

5.  At the time of the administrative hearing and the administrative law judge's decision, Moyer was 38 years of age. Tr. 33.  The Social Security regulations state

(continued...)

3

and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 33, 171, 269, 276 and 300.  During her elementary and secondary schooling, Moyer attended regular education classes. Tr. 276.  After high school, Moyer took paralegal courses at The Pennsylvania State University and became a certified paralegal and also completed training in cosmetology at the Altoona Beauty School in 2004. Tr. 221 and 276.  Moyer never worked as a paralegal or cosmetologist. Tr. 221 and 225.

Moyer has past relevant work experience[6] as a bartender, fast food worker, convenience store clerk, housekeeper, commercial cleaner, packer, sewing machine

_____

5.  (...continued)
that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  Moyer is considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c).

6.  Past relevant employment in the present case means work performed by Moyer during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

operator and short order cook. Tr. 24.  This work was

described by a vocational expert as ranging from

unskilled to skilled, light to heavy work.[7] Tr. 60-64.

_____

7.  The terms sedentary, light, medium and heavy work
are defined in the regulations of the Social Security
Administration as follows:

>        (a) *Sedentary work*. Sedentary work involves
> lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like
> docket files, ledgers, and small tools.
> Although a sedentary job is defined as one
> which involves sitting, a certain amount of
> walking and standing is often necessary in
> carrying out job duties.  Jobs are sedentary if
> walking and standing are required occasionally
> and other sedentary criteria are met.
>
>        (b) *Light work*.  Light work involves lifting no
> more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to
> 10 pounds.  Even though the weight lifted may
> be very little, a job is in this category when
> it requires a good deal of walking or standing,
> or when it involves sitting most of the time
> with some pushing and pulling of arm or leg
> controls.  To be considered capable of
> performing a full or wide range of light work,
> you must have the ability to do substantially
> all of these activities. If someone can do
> light work, we determine that he or she can
> also do sedentary work, unless there are
> additional limiting factors such as loss of
> fine dexterity or inability to sit for long
> periods of time.
>
>        (c) *Medium work*.  Medium work involves lifting
>                           (continued...)

Moyer's testimony at the administrative hearing and the records of the Social Security Administration reveal that Moyer had earnings in the years 1988 through 1991, 1993 through 2004, and 2007 through the date of the administrative hearing, January 20, 2010.  Tr. 33-34, 169 and 195.  Moyer's total reported earnings through the fourth quarter of 2008 were $68,016. 29. Tr. 169.

Moyer commenced working as a bartender for the American Legion in March, 2007, and continued working in that capacity at least 6 hours per day, 2 days per week up until the third quarter of 2008 when she commenced working as a bouncer at Memories, a sports bar and

---

7.  (...continued)
no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

6

grill, in Huntingdon, Pennsylvania. Tr. 33-34, 196-197 and 278.  At the time of the administrative hearing, Moyer was working as a bouncer part-time, 3 to 4 nights per week from 9:00 p.m. to 3:00 a.m. Tr. 33-34 and 52.

Moyer claims that she became disabled on July 1, 2006, because of obesity, asthma, allergic rhinitis, irritable bowel syndrome, sleep apnea, posttraumatic stress disorder, headaches, bilateral knee pain, low back pain, a spur on the left heel, and diabetes. Tr. 15, 119 and 270; Doc. 16, Plaintiff's Brief, p. 2 and 8.

For the reasons set forth below the court will affirm the decision of the Commissioner denying Moyer's application for disability insurance benefits.[8]

## STANDARD OF REVIEW

---

[8]. Moyer filed a prior application for disability insurance benefits on April 5, 2005, claiming that she became disabled on September 5, 2004, because of obesity, asthma, allergic rhinitis, irritable bowel syndrome, diabetes and an adjustment disorder with mixed anxiety and depressed mood. Tr. 105-106.  An administrative law judge denied that application on June 18, 2007. Tr. 23.  The Commissioner denied review and this court on September 23, 2008, affirmed the decision of the Commissioner. Tr. 101.

When considering a social security appeal, this court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala,

71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270
F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894
F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such
relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'" <u>Pierce v. Underwood</u>,
487 U.S. 552, 565 (1988)(quoting <u>Consol. Edison Co. v.
N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Comm'r
of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008);
<u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999).
Substantial evidence has been described as more than a
mere scintilla of evidence but less than a
preponderance.  <u>Brown</u>, 845 F.2d at 1213.  In an
adequately developed factual record, substantial
evidence may be "something less than the weight of the
evidence, and the possibility of drawing two
inconsistent conclusions from the evidence does not
prevent an administrative agency's finding from being
supported by substantial evidence." <u>Consolo v. Fed.
Maritime Comm'n</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

Furthermore,

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in

11

substantial gainful activity,[9] (2) has an impairment

that is severe or a combination of impairments that is

severe,[10] (3) has an impairment or combination of

impairments that meets or equals the requirements of a

_____

9.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

10.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

listed impairment,[11] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. § 404.1545;

─────────────────

11.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

12.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS AND OTHER EVIDENCE

The medical records reveal that Moyer was treated for both physical and psychological problems. The court will commence with some of Moyer's medical records that predate June 18, 2007, the date Moyer's prior application for disability insurance benefits was denied by an administrative law judge.

On June 21, 2006, Moyer had an appointment with Jeffrey M. Rosch, M.D., in Altoona, Pennsylvania, for an evaluation of nasal symptoms. Tr. 672. The record of that appointment states that Moyer was smoking 1/4 pack of cigarettes per day. Id. When Dr. Rosch reviewed Moyer's systems,[13] Moyer denied any gastrointestinal,

---

13. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/

(continued...)

musculoskeletal, neurological and psychiatric problems.[14]
Id.  The results of a physical examination were
essentially normal, including Moyer's blood pressure was
118/70. Tr. 674-675.  Moyer was diagnosed as suffering
from perennial allergic rhinitis, mild chronic
sinusitis, headache, and mild supraesophageal reflux
disease. Tr. 675.  Dr. Rosch along with an associate
Michael J. Davies, M.D., treated and monitored Moyer's
condition approximately every six months. Tr. 338-73,
481-521, 551-58 and 651-743.  Dr. Rosch encouraged Moyer
to quit smoking. Tr. 675.

Skin allergy testing revealed a positive
reaction by Moyer to house dust, mixed-ragweed and
grasses, the English Plantain plant, dock sorrel, mixed
trees, dogs, and cats.  Tr. 653.  Moyer was prescribed
medication therapy, including allergy shots and nasal
spray. Tr. 672.  Regular pulmonary function testing

---

13.  (...continued)
clinicalmed/ros.htm (Last accessed August 8, 2012).

14.  Moyer also denied gastrointestinal, musculoskeletal
and psychiatric symptoms on November 6, 2006; January
8, May 7, July 9, and November 5, 2007; May 12 and
November 10, 2008; and December 3, 2009.  Tr. 339, 346,
353, 360, 489, 497, 552 and 684.

demonstrated that Moyer's allergies were well-controlled with medications.[15]   Tr. 342, 345, 349, 352, 356, 359. 363, 366, 488, 492, 496, 500, 502, 555-556, 675 and 737-743.

On December 21, 2006, Moyer had a hemoglobin A1C blood test. Tr. 801.  The A1C blood test is a test that measures the amount of glycated hemoglobin or glycohemoglobin in the blood.  It is used to monitor the control of diabetes mellitus.  Glycohemoglobin is hemoglobin to which glucose is bound.  Glucose stays

---

15.  Moyer's lungs were routinely tested by spirometry which involves deeply inhaling and forcefully exhaling into a spirometer. On June 21, 2006, Moyer had a forced expiratory volume-one second (FEV1) predicted value of 3.34 and a best effort of 3.32.  Normal FEV1 is greater than 80 percent of the predicted value.  The percentage of predicted value on June 21 was 99 percent (3.32/3.34). Tr. 738; Asthma & Spirometry - How Spirometry is Used to Diagnose and Manage Asthma, About.com, http:// asthma.about.com/od/adultasthma/a/art_AA_spiro.htm (Last accessed August 8, 2012). Also, the FEV1 to FVC ratio is typically 80-85 percent or greater in healthy patients younger than 40 years old. Spirometry 360, http://depts.washington.edu/imtr/spirotrain/what/ interpret/index.html (Last accessed August 8, 2012). On June 21st this ratio was 3.32/3.62  or 92 percent. Tr. 738.  Normal results were obtained on May 3 and November 6, 2006;  January 8, May 7, July 9 and November 5, 2007; May 12 and November 10, 2008; and June 4 and December 3, 2009. Tr. 345, 352, 359, 366, 488, 496, 503, 556, 687, 705 and 737-738.

attached to hemoglobin for the life of the red blood cells, 120 days.  A1C reflects the average blood glucose and gives a good estimate of how well an individual manages his or her diabetes over the prior 2 to 3 months.  The normal A1C level is 7 percent according to the American Diabetes Association and 6.5 percent according to the American Association of Clinical Endocrinologists.   Moyer's blood test result was 5.7 percent revealing that her diabetes was well-controlled. Tr. 801.  An A1C level of 5.5 percent translates to an estimated average glucose of 111. American Diabetes Association, Estimated Average Glucose, http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/estima ted-average-glucose.html (Last accessed August 9, 2012). Normal fasting blood glucose is 70-99 and normal blood glucose 2 hours after eating is 70-145. Diabetes Health Center, Blood Glucose, WebMd, http://diabetes. webmd.com/blood-glucose?page=3 (Last accessed August 9, 2012).  In May, 2007, the result of an A1C blood test was 6.5 and in November, 2007, it was 6.4. Tr. 381 and

793.   The record does reveal that in October, 2009, the
result of an A1C blood test was 11.5 indicating that
Moyer's diabetes was not under control.   Tr. 842.   Up to
that point Moyer had been taking Metformin, an oral
medication to control her diabetes. Tr. 36 and 558.   In
January, 2010, Moyer commenced taking insulin and there
is no indication that the change in medication failed to
bring Moyer's diabetes under control.   Id.

        In January, 2007, Moyer was treated for rosacea
of the head and chest at the Hershey Medical Center.  Tr.
331-333.   Her condition improved with treatment,
including the use of ointments, and she did not have a
history of ongoing dermatologic problems, including skin
rashes.[16]   Tr. 232, 331-332, 339, 342, 349-50, 356, 360,
363, 484-485, 492-493, 500-501, 528, 549, 555, 557, 675,
686-687 and 759.   At an appointment with Dr. Rosch on
May 7, 2007, and July 9, 2007, Moyer denied any
dermatological problems.  Tr. 348 and 353.   Dr. Rosch's

---

16.  At appointments with Dr. Davies on November 5,
2007, and November 10, 2008, Moyer denied any
dermatologic symptoms. Tr. 339 and 489. The record of
the November 5, 2007, appointment further reveals that
Moyer recently had taken a trip to Las Vegas and that
she "did great while she was" there. Tr. 341.

physical examinations of Moyer revealed normal findings, including a normal blood pressure of 110/72 on May 7 and 124/70 on July 9. Tr. 348 and 355.  He also observed no skin rashes. Tr. 349 and 356.[17]

There are laboratory reports in the record indicating that Moyer had elevated liver function blood tests. Tr. 794.  However, up to May 2009, it was consistently noted on the laboratory reports that the levels were mildly elevated and stable. Tr. 367, 368, 369, 370 371, 372, 504, 505, 506, 507, 509 and 723. From the end of May, 2009 through November, 2009, there was some fluctuation in the results of the liver function tests.  Tr. 510, 511, 513, 514, 515 and 551. However, no treating or examining physician has opined that her liver condition has an impact on her physical or mental functioning.[18]

--------

17. At the appointments on May 7 and July 9, Moyer admitted that she was smoking less than a half pack of cigarettes per day. 346 and 353.

18. In March, 2010, after the administrative law judge rendered his decision, Moyer was diagnosed with cirrhosis of the liver. Tr. 865.  No treating or examining physician opined that cirrhosis of the liver would impact Moyer's physical or mental functioning.

At an appointment with Michael D. Cesare, D.O., on November 5, 2007, Moyer complained of left heel pain. Tr. 389.  On that date and January 28, 2008, Moyer had x-rays of her left foot which revealed a calcaneal (heel) spur.  Tr. 825-826.  On November 8, 2007, Dr. Cesare referred Moyer to physical therapy (3 times per week for 4 weeks). Tr. 389.

The court discerns no further record of treatment for Moyer's heel spur in the record and at an appointment with Dr. Davies on May 12 and November 10, 2008, and June 4 and December 3, 2009, Moyer denied any musculoskeletal symptoms. Tr. 481, 489, 497 and 552. Furthermore, no treating or examining physician has opined that the heel spur would have an impact on her physical or mental functioning.

The record reveals that Moyer is morbidly obese with a Body Mass Index of 50.3.[19]  Tr. 548-550.  On September 21, 2009, Moyer had a consultation with Anita Courcoulas, M.D., regarding gastric bypass surgery as a possible treatment for her obesity. Id.   At that

---

19.  Moyer is 5' 7" tall and on November 16, 2009, weighed 328 pounds. Tr. 45 and 527.

appointment, Moyer stated that she had a history of smoking one pack a day for ten years but that she quit smoking approximately a year prior to the appointment. Tr. 549. Moyer also stated that she had obstructive sleep apnea, but further indicated that she had never undergone a sleep study.  Id.  Dr. Courcoulas referred Moyer for a sleep study which revealed that she had sleep apnea. Tr. 550 and 833-37.  Moyer was recommended for C-PAP titration. Tr. 834.  Once Moyer received the C-PAP machine, Moyer's sleep study revealed that it resolved her breathing disorder. Tr. 828-832.  Dr. Courcoulas conducted a physical examination of Moyer which revealed, inter alia, that Moyer's blood pressure was normal at 114/70 and that she could move all of her extremities equally and well.  Tr. 549.

In October, 2009, George Jabbour, M.D., conducted a cardiac evaluation of Moyer to clear her for gastric bypass surgery. Tr. 527-533.  Moyer told Dr. Jabbour that she was currently smoking half a pack of cigarettes per day and consuming alcohol, less than one drink per day. Tr. 527.  Moyer denied having any chest pain, shortness of breath, excessive sputum, wheezing,

gastrointestinal problems, back and joint pain, joint swelling, muscle cramps, muscle weakness, and skin rashes and itching. Tr. 527-528.  Moyer further denied having any psychiatric problems, including depression, anxiety, memory loss, and hallucinations. Tr. 528.  The results of a physical examination were essentially normal, including normal blood pressure at 128/70. Tr. 527-528.  Moyer had a normal gait, muscle strength and muscle tone. Tr. 529.  Her back exhibited normal alignment and mobility with no deformity. Id.  A mental status examination revealed that Moyer's judgment was intact; she was oriented to time, place and person; her memory was intact for recent and remote events; and she exhibited no depression, anxiety or agitation. Tr. 528.

Dr. Jabbour reviewed Moyer's prior test results, including a stress test which was negative for ischemia. Tr. 525-528.  Moyer's EKG was normal, chest x-rays were unremarkable, and an upper gastrointestinal series was normal. Tr. 534 and 539-541.  A cardiac catheterization

revealed no evidence of significant coronary artery disease and a normal ejection fraction.[20]  Tr. 758.

On November 6, 2009, Moyer had a second appointment with Dr. Jabbour. Tr. 758-760.  At that appointment, Moyer admitted she was smoking half a pack of cigarettes per day. Tr. 758.  When Dr. Jabbour reviewed Moyer's symstems, Moyer denied, inter alia, nausea, vomiting, diarrhea, constipation, abdominal pain, back pain, joint pain, joint swelling, muscle cramps, muscle weakness, arthritis, skin rashes or itching, depression, anxiety, memory loss and mental disturbance. Tr. 759.  The results of a physical examination were completely normal, including her blood pressure was 116/68 and she had a normal gait. Tr. 758-759.  A mental status examination revealed that Moyer's judgment was intact; she was oriented to time, place and person; her recent and remote memory was intact; and she exhibited no depression, anxiety or agitation. Tr. 759.  Dr. Jabbour found that Moyer's coronary arteries were

---

20.  Ejection Fraction is a measurement of the percentage of blood leaving the heart each time it contracts.

normal. Tr. 760.  Dr. Jabbour, based on his examination
of Moyer and his review of the test results, cleared
Moyer for gastric bypass surgery.  Id.

On January 26, 2010, Melinda Kistler, a
certified physician's assistant, completed a medical
source statement of Moyer's ability to do work-related
physical activities. Tr. 744-750.  Ms. Kistler found
that Moyer had no physical limitations given the
diagnostic evidence and her review of Moyer's medical
file. Id.

The record reveals that Moyer was involved in
psychotherapy since at least December, 2006. Tr. 429-
446.  Moyer's primary treating psychiatrist was G.
Martin Keeney, M.D. Tr. 426-428.  In March, 2007, Dr.
Keeney concluded that Moyer suffered from posttraumatic
stress disorder and depressive disorder, not otherwise
specified, and began prescribing medication.[21]  Tr. 426.
Moyer continued to see Dr. Keeney about every month. Tr.
414-426, 590-640 and 751-757.  In August, 2007, Moyer
went on a trip to Las Vegas and subsequently told her

---

21.  The impetus for the PTSD appears to be a motor
vehicle accident. Tr. 752.

therapist on August 28, 2007, that she had a great time
and "felt physically great." Tr. 435.  She further
stated that she planned to go back in September, 2008,
and she had no negative comments to make. Id.  In
November, 2007, Dr. Keeney reported that Moyer's
posttraumatic stress disorder and depression were
stable. Tr. 419.  In December, 2007 and January, 2008,
Moyer acknowledged that her medication therapy helped
her condition. Tr. 414 and 416.

In June 2008, Dr. Keeney wrote a short statement
advising that Moyer could not work as a bartender at the
American Legion because of an exacerbation of her
condition. Tr. 468. In March 2009, Dr. Keeney reported
that Moyer was doing "ok" at work and her impulsivity
was stable. Tr. 596.  In June 2009, Moyer told Dr.
Keeney that she had recently obtained full custody of
her daughter. Tr. 593.  That same month, Dr. Keeney
wrote a letter wherein he stated that he believed that
Moyer's condition prevented her from "performing either
appropriately or safely within a full-time setting in
many venues." Tr. 467.  In September and December,
2009, Dr. Keeney reported that Moyer's posttraumatic

stress disorder was stable and Moyer was doing "ok." Tr.
590-591.  On January 28, 2010, Dr. Keeney completed a
medical source statement of Moyer's work-related mental
abilities. Tr. 751-757.  Dr. Keeney believed that Moyer
had a marked restriction in her ability to interact
appropriately with the public and supervisors. Tr. 752.
Dr. Keeney, however, indicated Moyer had no problem
understanding and remembering and carrying out simple
instructions; making judgment on simple-work related
decisions; and understanding and remembering and
carrying out complex instructions.  Tr. 751.  He did
find that she had a mild to moderate impairment in her
ability to make judgments on complex work-related
decisions. Id.  Dr. Keeney did not indicate when Moyer's
mental impairments arose or how long they were expected
to last.

     Dr. Keeney did find that Moyer could perform
activities such as shopping, traveling without a
companion for assistance, ambulating without an
assistive device, walking a block at a reasonable pace
on rough or uneven surfaces, using standard public
transportation, climbing a few steps at a reasonable

pace with use of a single hand rail, preparing simple meals and feeding herself, caring for personal hygiene and sorting, handling and using paper and files. Tr. 756.

In April, 2008, Sharon Becker Tarter, Ph.D., a psychologist, reviewed Moyer's medical records on behalf of the Bureau of Disability Determination. Tr. 450-466. Dr. Tarter concluded that Moyer suffered from an anxiety-related disorder which did not meet or equal a listed impairment. Id. Dr. Tarter further opined that Moyer was able to meet the basic mental demands of competitive work on a sustained basis. Tr. 452.

At the administrative hearing, Moyer testified that she was able to use a vacuum cleaner, do laundry, shop for groceries, drive, help her nine-year-old daughter with homework, attend her daughter's soccer games, go out to eat at restaurants, take care of pets (a dog and a cat), use a computer, and watch TV. Tr. 48-51. She further testified that she had no problems concentrating or focusing. Tr. 49.

During the initial claim process, Moyer was requested to provide information regarding her

27

functional limitations.  On April 7, 2008, Moyer indicated in a document entitled "Function Report – Adult" that she lives in a trailer with her daughter and that she "get[s her] child ready for school - take[s] child to school - sometimes works - sleep[s]." Tr. 297. Moyer indicated that she prepares meals for her daughter and helps her daughter with her homework. Tr. 298.  She further stated that she takes care of pets. Id.  Moyer is able to take care of her own personal needs, including dressing, bathing, hair care, shaving, and feeding herself. Id.  Moyer needs no reminders to take care of personal needs and grooming and to take her medicines. Tr. 299.  Moyer is able to prepare her own meals and stated that she is able do house cleaning and laundry. Id.   Moyer noted that she is able to drive a car; that she is able to go out alone; she is able to shop in stores and by mail; and she is able to pay bills, count change, handle a savings account and use a checkbook and money orders. Tr. 300.   Moyer indicated that she enjoys watching TV.  Tr. 301.  Moyer noted no problem with lifting, squatting, bending, standing, reaching, sitting, kneeling, talking, hearing, stair

climbing, seeing, memory, completing tasks, concentration, understanding, following instructions and using her hands. Tr. 302. Moyer stated that she gets along well with authority figures. Tr. 303.

**<u>DISCUSSION</u>**

The administrative law judge, at step one of the sequential evaluation process, found that Moyer had not engaged in substantial gainful work activity since July 1, 2006, the alleged disability onset date. Tr. 15. Specifically, the administrative law judge stated as follows: "The evidence shows that the claimant has worked since July 1, 2006, the alleged onset date[.] However, this work activity is part-time in nature and does not rise to the level of substantial gainful activity[.]" <u>Id.</u>

At step two of the sequential evaluation process, the administrative law judge found that Moyer had the following severe impairments: "obesity, asthma, allergic rhinitis, irritable bowel syndrome, sleep apnea, and post-traumatic stress disorder[.]" Tr. 15-16. The administrative law judge further found as follows:

29

> The medical evidence also shows that the
> claimant has impairments consisting of high
> blood pressure, headaches, bilateral knee pain,
> low back pain, a calcaneal spur of the left heel

and diabetes mellitus. However, there is no evidence of
any significant complications and/or work-related
limitation due to these conditions documented in the
record. . . . The Administrative Law Judge notes that
the claimant has not required frequent inpatient
hospital confinement/emergency room care due to high
blood pressure, headaches, bilateral knee pain, low back
pain, calcaneal spur, or diabetes mellitus. . . it is
noted that in January 2010 Ms. Kistler, a treating
primary care physician assistant, reported that she was
unaware of any exertional limitation due to the
claimant's condition[.] Accordingly, the Administrative
Law Judge concludes that these additional impairments
individually and in combination do not have more than a
minimal impact on the claimant's ability to perform
work-related activities and are therefore "nonsevere."

Tr. 16.

At step three of the sequential evaluation

process, the administrative law judge found that Moyer's

impairments did not individually or in combination meet

or equal a listed impairment. Tr. 16-19.  The

administrative law judge explained in detail his basis

for his step three finding.  The explanation consisted

of nine paragraphs.

At step four of the sequential evaluation

process, the administrative law judge found that Moyer

could not perform her past relevant work but had the

residual functional capacity to perform a limited range

of unskilled, light work as defined in the regulations.

Tr. 19.  Specifically, the administrative law judge

found that Moyer could perform light work,

> except the claimant is limited to frequent
> bending, balancing, stooping, kneeling,
> crouching, crawling, and climbing of ramps and
> stairs and no climbing of ladders, ropes, or
> scaffolds.  In addition, the claimant is
> limited to no exposure to heat, cold, humidity,
> wetness, noise above street level, pulmonary
> irritants such as fumes, odors, dusts, or gases,
> unprotected heights, and dangerous machinery.
> Moreover, the claimant is limited to simple,
> routine tasks involving no work at a production-
> rate pace and no more than simple, short
> instructions and simple work-related decisions
> with few work place changes. Finally, the
> claimant is limited to only occasional
> interaction with the public, supervisors, and
> co-workers.

Tr. 19.

At step five, the administrative law judge,

based on a residual functional capacity of a limited

range of light work as described above and the testimony

of a vocational expert, found that Moyer had the ability

to perform unskilled, light work as a routing clerk,

floor worker, and brake adjuster and that there were a

significant number of such jobs in the local and

national economies. Tr. 25.

The administrative record in this case is 900
pages in length and the court has thoroughly reviewed
that record.   The administrative law judge did an
excellent job of reviewing Moyer's vocational history
and medical records in his decision. Tr. 13-25.
Furthermore, the brief submitted by the Commissioner
sufficiently reviews the medical and vocational evidence
in this case. Doc. 17, Brief of Defendant.

Moyer argues that the administrative law judge
erred by (1) failing to find at step three of the
sequential evaluation process that her impairments met
or equaled a listed impairment, (2) finding that her
impairments of headaches, knee pain, low back pain,
calcaneal spur of the left heel and diabetes were non-
severe, (3) failing to find that she could not maintain
attendance and concentration sufficiently to engage in
light work as a result of her allergy and dermatologic
impairments, and (4) failing to find her disabled as a
result of a combination of all her impairments.   Moyer
also contends that her new impairment of cirrhosis of
the liver renders her disabled.   Based on our review of

the record, the court finds no merit in Moyer's
arguments.

Moyer's first argument is premised on the
contention that she met the requirements of certain
physical and mental health listings.  The purpose of the
Listings of Impairments is to describe impairments
"severe enough to prevent a person from doing any
gainful activity," regardless of age, education or work
experience.  20 C.F.R. § 404.1525(a); see also Sullivan
v. Zebley, 493 U.S. 521, 532 (1990).  The Listings
operate as a presumption of disability without further
inquiry as to whether the claimant can actually perform
prior relevant work or other work available in the
local, regional or national economies. Id.  To qualify
for benefits by showing that an impairment, or
combination of impairments, is equivalent to a listed
impairment, Moyer had the burden of presenting "medical
findings equivalent in severity to all the criteria for
the one most similar impairment."  Sullivan, 493 U.S. at
531; Bowen v. Yuckert, 482 U.S. 137, 146 n.5
(1987)(stating that it is the claimant's burden to

present medical findings that show that his impairment
matches or is equal in severity to a listed impairment).

Moyer has not explained how she meets the
criteria of any listing.  Her argument is completely
conclusory.  In fact she made the same argument in her
prior action.  The Report and Recommendation in that
prior action which the court adopted stated in pertinent
part as follows:

> The plaintiff presents a generally stated
> argument that the ALJ erred in finding at Step
> Three that no listed impairment's criteria are
> met.  The plaintiff's argument is present
> without reference to the particular criteria of
> the listed impairment.  In presenting this
> argument in her brief, the plaintiff asserts
> that the ALJ did not afford appropriate weight
> to the treating physician's opinion.  But the
> argument does not show how a treating
> physician's opinion stated that the plaintiff's
> condition meets or equals one or more of the
> listed impairments.

Tr. 110-111.  In the present case, Moyer recites some
medical evidence in her brief but she does not describe
why her impairments meet or equal a particular listing.
Moyer also continues to argue that the administrative
law judge discounted medical opinion evidence, namely,
the opinions of Dr. Rosch and Dr. Keeney.  However,
there was no medical opinion evidence in the record from

34

those physicians stating that Moyer's impairment either
met or equaled the criteria of a listed impairment.
In fact, with respect to mental impairments, Dr.
Tarter's evaluation reveals that Moyer did not meet the
criteria of any mental health listing. Tr. 450-466.
Furthermore, Ms. Kistler indicated that Moyer had no
physical exertional impairments.  The fact that an
individual has no physical exertional impairments
strongly suggests that the individual could not meet the
criteria of any listing involving a physical condition.

     The Social Security regulations require that an
applicant for disability insurance come forward with
medical evidence "showing that [the applicant] has an
impairment(s) and how severe it is during the time [the
applicant] say[s] [he or she is] disabled" and "showing
how [the] impairment(s) affects [the applicant's]
functioning during the time [the applicant] say[s] [he
or she is] disabled."  20 C.F.R. § 404.1512(c).  Moyer
failed to provide such evidence. No treating physician
provided a statement indicating that Moyer had
functional limitations for the requisite continuous 12

month period[22] that would prevent her from engaging in the limited range of light work set by the administrative law judge.

The record contains a functional assessment from a state agency psychologist who reviewed Moyer's medical records and the physical functional assessment from Ms. Kistler. The administrative law judge's reliance on those assessments was appropriate. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]"). The administrative law judge appropriately evaluated Moyer's severe and non-severe impairments and took into account Moyer's functional limitations in the residual functional capacity assessment.

_____

22. As stated earlier in this memorandum, to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

In setting the residual functional capacity, the
administrative law judge considered Moyer's credibility
and determined that Moyer's statements concerning the
intensity, persistence and limiting effects of her
symptoms were not credible to the extent that they were
inconsistent with the ability to perform a limited range
of light work. Tr. 21.  The administrative law judge was
not required to accept Moyer's subjective claims
regarding her physical or mental limitations. See Van
Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir.
1983)(providing that credibility determinations as to a
claimant's testimony regarding the claimant's
limitations are for the administrative law judge to
make).  It is well-established that "an [administrative
law judge's] findings based on the credibility of the
applicant are to be accorded great weight and deference,
particularly since [the administrative law judge] is
charged with the duty of observing a witness's demeanor
. . . ."  Walters v. Comm'r of Soc. Sec., 127 F.3d 525,
531 (6th Cir. 1997); see also Casias v. Sec'y of Health
& Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We
defer to the ALJ as trier of fact, the individual

37

optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed Moyer when she testified at the hearing on January 20, 2010, the administrative law judge is the one best suited to assess the credibility of Moyer.

Finally, Moyer's contention that the administrative law judge did not consider her impairments in combination and erred by failing to find certain conditions to be severe needs no elaborate discussion. It is clear from a review of the administrative law judge's thorough opinion that he considered both Moyer's severe and non-severe impairment in combination when setting Moyer's residual functional capacity. Furthermore, the record amply supports the administrative law judge's finding that Moyer's high blood pressure, headaches, knee pain, low back pain, calcaneal spur and diabetes were non-severe impairments. No treating or examining physician indicated that those conditions would impact her mental or physical work-related functional abilities.

Our review of the administrative record reveals that the decision of the Commissioner is supported by

substantial evidence.  The court will, therefore,

pursuant to 42 U.S.C. § 405(g), affirm the decision of

the Commissioner.

An appropriate order will be entered.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  August 29, 2012.